BESTER *v.* STATE.

No. 39458 January 17, 1955 77 So. 2d 270

*William H. Stewart,* Poplarville, for appellant.

708

Joe T. Patterson, Asst. Atty. Gen., Jackson, for appellee.

KYLE, J.

Leander Bester, the appellant, was jointly indicted with Georgia Lee Fowler, at the April 1954 Term of the Circuit Court of Pearl River County on a charge of lar-

ceny of 67 sacks of tung nuts of the value of 80 cents per sack, and of the total value of $53.60, the personal property of W. M. McGuire. The case was tried at the April 1954 Term of the court, and the appellant was convicted and sentenced to imprisonment in the state penitentiary for a term of four years. From that judgment he prosecutes this appeal.

The testimony of the State's witnesses showed that W. M. McGuire was the owner of a 320-acre tung nut farm in the White Sand community of Pearl River County, which was inclosed by a fence and was subdivided by a cross fence. The tung nuts were harvested during the late fall and winter months of the year, and as an aid to the handling and marketing of the nuts, the nuts as they were gathered were placed in heavy sacks, usually made of jute, which were securely tied with durable strings.

On the morning of January 9, 1954, Jim Stanford, the manager of the McGuire farm, found that the gates on the road across the farm had been left unlocked, and there was a sack of tung nuts lying by the road side near the inner gate. Upon further investigation he found that a quantity of sacked tung nuts was missing from the tung nut pile, a short distance from the inner gate. Stanford drove immediately to the Wade Tung Oil Company plant at Bogalusa, which was only a few miles away, to make inquiry about tung nuts received at the plant during the night. As he drove into the millyard, he observed a pile of sacked tung nuts on the ground just outside the office building near the scales where trucks were weighed. Stanford examined the sacks of tung nuts and found that they were tied with the treated strings of the kind used on the McGuire farm and that the sacks had black dots at the top which corresponded with the marks that he had used to identify sacks purchased for use on the McGuire farm. Stanford made inquiry at the office concerning the load of tung nuts which had been dumped on the ground just outside the office building; but the assistant manager, who had just arrived at the office, was

unable to give any information about the tung nuts. Stanford then told the assistant manager that a quantity of sacked tung nuts was missing from the McGuire farm, and requested the assistant manager to "call the law" when any one came to claim the tung nuts piled on the ground near the scales.

Later during the morning the appellant drove a truck loaded with tung nuts, sacked in burlap sacks, upon the scales of the Wade Tung Oil Company to be weighed and paid for at the prevailing market price; and while the truck was being weighed the appellant told the assistant manager of the plant that he had another truck load which he had brought to the scales the night before and had unloaded near the scales because there was no one at the office at that hour of the night to weigh them. After dumping the load of tung nuts which he then had on his truck on the large pile near the hulling room, about 200 feet from the office, the appellant returned to the scales, loaded the nuts which he had left there during the night upon his truck and had them weighed, and then drove the truck to the large pile in the center of the yard and unloaded them. The assistant manager paid the appellant by check for the two truck loads of tung nuts; and the assistant manager testified that while the appellant was in the office the appellant said, "Some of the fellows out there seem to think they are stolen nuts, but they are not. I brought them from home. They belong to my mother, and she's got some more in the crib." There were 71 sacks in the load which had been dumped outside the office during the night; and the sales ticket showed that the appellant was paid $76.17 for the lot.

Stanford returned to the Wade plant later during the day and found that the appellant had delivered another load of tung nuts to the plant during the morning and had told the plant manager that the pile of tung nuts on the ground near the scales were nuts that he had hauled during the night, and that the appellant had reloaded the tung nuts on his truck and had dumped them

on the big pile near the hulling room. Stanford went with the mill foreman to the big pile and quickly identified the sacks of nuts which belonged to the McGuire farm.

Stanford testified that he was able to identify the sacks which belonged to the McGuire farm by the dark green strings with which they were tied and a black dot at the top of each sack. Some of the sacks were also marked on the inside with the letter ''M.'' He identified 17 of the sacks by the black dots and the letter ''M,'' and approximately 50 sacks by the dark green strings.

Creel, the mill foreman, testified that Stanford had no difficulty in pointing out to him the sacks of tung nuts on the pile which came from the McGuire farm. Creel had seen the appellant unload the tung nuts on the big pile during the morning; and Creel stated that the sacks which Stanford identified as sacks belonging to the McGuire farm were sacks found on that part of the pile where the appellant had dumped the two loads that he had brought to the mill. Stanford requested Creel to save the sacks for him, and Creel stated that he later delivered the sacks to the deputy sheriff, W. O. Moody.

W. O. Moody, the deputy sheriff who assisted Stanford in the investigation, testified that he made measurements of the tire tracks which were left by the pickup truck at the place where the nuts were loaded on the McGuire farm, and compared the measurements with the tires on the appellant's truck. The measurements and distinguishing peculiarities of the tire tracks corresponded with the measurements and distinguishing peculiarities which he observed on the tires of the appellant's truck. Moody stated that he went to Bogalusa that afternoon, and that Creel turned over to him two of the sacks of tung nuts which Stanford had identified earlier during the day, and that he returned to the plant on Monday and got the other sacks. Two sacks were offered in evidence during the trial; and Moody testified

that the two sacks were two of the sacks turned over to him by Creel the day the appellant was arrested.

The appellant testified that the tung nuts which he had hauled to the mill on the night of January 8 belonged to his mother, who owned a 20-acre tung orchard in the White Sands community. The appellant stated that he loaded the tung nuts from a crib on his mother's place around 7:00 o'clock, and started towards Bogalusa immediately thereafter, but that his truck broke down while he was enroute to the mill, and he did not arrive at the mill until 10:30 o'clock. He found no one at the mill to weigh the tung nuts; and he unloaded them at the scales and returned to his home for a second load. He and Solomon Hales loaded the rest of the nuts the next morning and carried them to the mill. He stated that the nuts were sacked in different kinds of sacks; that he did not know what kind of strings they were tied with; but that none of the sacks that he carried to Bogalusa had black dots at the top or a letter "M" painted in black on the inside.

Several other witnesses testified for the appellant, including his brother, his sister-in-law and Solomon Hales, who helped load the tung nuts Saturday morning. All of these witnesses corroborated in different ways the appellant's claim that the nuts which he hauled to the mill were nuts belonging to the appellant's mother.

 The first point argued by the appellant's attorney as ground for reversal of the judgment of the lower court is that the court erred in admitting in evidence two of the tung nut sacks which were found on the large pile near the hulling mill on the Wade Tung Oil Company yard, where the truck load of tung nuts in question had been unloaded, and which were identified by the State's witness Jim Stanford as two of the tung nut sacks belonging to W. M. McGuire. It is contended that the two sacks should not have been admitted in evidence for the reason that there was no positive identification of the sacks as a part of the truck load of tung

nuts which the appellant had hauled to the mill during the night and had dumped on the pile a few hours before Stanford picked them out as sacks belonging to the McGuire farm. The appellant says that there was testimony in the record to show that other persons had sacks bearing the same markings in their possession and that other people used the same kind of string in sacking tung nuts for the market, and that no witness actually identified the two sacks as a part of the load which the appellant carried to the mill during the night.

But we think that the two sacks were sufficiently identified to make them admissible as evidence in the case. The two sacks bore the identification marks which Stanford testified that he had painted on the sacks used on the McGuire farm, a black dot near the top, and the letter ''M'' painted near the bottom of the inside of the sack. The sacks were tied with strings of a special kind which Stanford testified he used in sacking the nuts produced on the McGuire farm. Proof of the fact that pieces of the specially treated string may have fallen into the hands of other persons, or that such string could be purchased on the open market, did not render the evidence incompetent, although the proof might have affected the weight to be attached to the evidence.

It is next argued on behalf of the appellant that the court erred in granting an instruction, which appears on page 180 of the record, and in which the property alleged to have been stolen is described as ''being the personal property of W. M. McGuire.'' But we think there is no merit in this contention. It is well-settled that in a prosecution for larceny the State must prove ownership of the stolen property as alleged in the indictment beyond a reasonable doubt. 52 C. J. S., 972, Larceny, par. 134; Johnson v. State, 186 Miss. 405, 191 So. 127. And where ownership of stolen property is laid in a person named, the jury should be instructed that the ownership of the property must be proved as laid. 52 C. J. S., 995, Larceny, par. 148.

■■■ The part of the above mentioned instruction complained of merely mentions the ownership of the property as one of the elements of the charge which the State was required to prove. The instruction meant, and we think the jury understood the instruction to mean, that the jury could not convict, unless the evidence showed beyond every reasonable doubt and to the exclusion of every other reasonable hypothesis each of the elements of the crime set forth in the instruction, including the ownership of the property by W. M. McGuire. Golding v. State, 144 Miss. 298, 109 So. 731; Chester v. State, 216 Miss. 748, 63 So. 2d 99.

■■■ Finally, it is argued that the court erred in granting the instruction which appears on page 181 of the record, and which reads in part as follows:

"The court instructs the jury for the state circumstantial evidence is competent and legal in criminal cases and it is not necessary to have an eye witness to the crime, if all the facts and circumstances are sufficient to convince the jury beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis that the defendant, Leander Bester, Lee A. Bester, is guilty as charged * * *."

The complaint made of the above mentioned instruction is that it was improper for the court to instruct the jury that circumstantial evidence is competent and legal in criminal cases.

■■ We think that the instruction should not have been given in the form requested. There is no justification for a charge that circumstantial evidence is legal and competent, since its compentency is for the court, and all admitted testimony must be taken to be competent. Alexander, Mississippi Jury Instructions, First Ed., 1953, Vol. 1, p. 358, Sec. 1501; Williams v. State, 95 Miss. 671, 49 So. 513. But as stated by the Court in the Williams case, supra, the giving of such instruction does not constitute reversible error, unless it appears that the party complaining has been prejudiced thereby. The

remaining part of the above mentioned instruction made it clear that the jury must believe from the evidence beyond every reasonable doubt and to the exclusion of every other reasonable hypothesis that the appellant was guilty of the crime charged against him before they could convict him; and we think that the appellant was not prejudiced by the error complained of and that such error does not require a reversal of the judgment.

The judgment of the lower court is therefore affirmed. Affirmed.

*Roberds, P. J.,* and *Hall, Lee* and *Holmes, JJ.,* concur.